IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE GRAND JURY SUBPOENA | § | |
| ISSUED TO TWITTER, INC. | § | No. 3:17-mc-40-M-BN |
| | § | |
| | § | **SEALED** |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

Movant Twitter, Inc. ("Movant" or "Twitter") has filed a sealed Motion to Quash Grand Jury Subpoena and Vacate Gag Order. *See* Dkt. No. 1 (the "Motion to Quash and Vacate," "Motion to Quash," or "Motion to Vacate").

Chief Judge Barbara M. G. Lynn referred the Motion to Quash and Vacate to the undersigned United States magistrate judge for hearing, if necessary, and to submit proposed findings and recommendations for disposition of the Motion to Quash pursuant to 28 U.S.C. § 636(b). *See* Dkt. No. 5.

The government filed a response to the Motion to Quash and Vacate, *see* Dkt. No. 13; Twitter filed a reply, *see* Dkt. No. 14; and, on August 15, 2017, the undersigned held oral argument on the Motion to Quash and Vacate, at which Twitter's counsel and the government's counsel appeared, *see* Dkt. No. 19.

The undersigned made Findings, Conclusions, and a Recommendation on September 22, 2017, recommending that the Court grant the Motion to Vacate but deny the Motion to Quash because Twitter had not established its own injury in fact. *See* Dkt. No. 21. Twitter filed Partial Objections. *See* Dkt. No. 22.

After conducting a *de novo* review of the parts objected to, the Court accepted the undersigned's Findings, Conclusions, and Recommendation, thereby vacating the Gag Order. *See* Dkt. No. 25. As to Twitter's Motion to Quash, the Court remanded the matter to the undersigned to schedule a prompt hearing regarding Twitter's injury in fact, noting that the Court would accept the undersigned's Findings if Twitter did not present evidence of its injury in fact. *See id.*

The undersigned conducted the required evidentiary hearing on October 27, 2017, at which counsel for Twitter and the Government appeared. *See* Dkt. No. 29.

For the reasons and to the extent explained below, the Court should grant in part Twitter's Motion to Quash Grand Jury Subpoena [Dkt. No. 1].

## Background

The undersigned reviewed in detail the relevant background of this case in the September 22, 2017 Findings, Conclusions, and Recommendation. The undersigned recounts the pertinent facts again here.

On May 11, 2017, the government's counsel, Assistant United States Attorney Douglas William Gardner, caused a grand jury subpoena (the "Subpoena") to be served on Twitter. The Subpoena required Twitter to appear and testify before the grand jury on June 6, 2017, in connection with a grand jury investigation into Justin Mark Shafer's alleged cyber-harassment of FBI Agent ███████████, the agent who signed the criminal complaint in *United States v. Rivello.*

The Subpoena sought subscriber data for five Twitter accounts (@dawg8u, @abtnatural, @Popehat, @associatesmind, and @PogoWasRight) and required Twitter

to provide records and information associated with those accounts, including the account users' names, addresses, and Internet Protocol ("IP") addresses. These five Twitter accounts, along with Justin Shafer via his own Twitter account @JShafer817, participated in an online conversation regarding the *Rivello* case that mentioned Agent ███. The government wished to investigate the users involved in the discussion, as Shafer's potential associates, to determine if they were involved in cyberstalking Agent ███ or had any information that would aid the government's investigation of Shafer's alleged crime.

Shafer was publicly indicted on April 19, 2017. Shortly after, on May 16, 2017, the Court entered a 18 U.S.C. § 2705(b) order prohibiting Twitter from notifying any person of the existence of the Subpoena.

On June 5, 2017, Twitter filed its Motion to Quash and Vacate that is before the Court.

Because the Gag Order was vacated per the Court's Order on October 25, 2017, the Court is left to decide only the Motion to Quash the Subpoena.

Twitter's opposition to the Subpoena is grounded in the First Amendment. Twitter argues that the Subpoena abridges Twitter's users' First Amendment rights to anonymous speech, association, and the receipt of ideas. Based on these First Amendment infringements, Twitter asserts that the government is barred from obtaining the information the Subpoena requests without first demonstrating (1) a compelling interest in the information and (2) a substantial relationship between that information and the investigation of Justin Shafer. Twitter acknowledges the

government's compelling interest in investigating the alleged cyberstalking of an FBI agent but explains that the government failed to establish the latter element   because the only connection between Shafer and the five Twitter accounts listed in the Subpoena is that they all participated in what Twitter describes as a "benign conversation" about *Rivello*. Dkt. No. 1 at 1.

In its response, the government first questions whether Twitter has standing to challenge the Subpoena. The government maintains that Twitter has not suffered an injury in fact; that Twitter's users have not suffered an injury in fact; and that, even if Twitter's users have suffered the requisite injury, Twitter does not have a sufficiently close relationship to its users to assert third-party standing.

The government argues in the alternative that the Subpoena does not impinge on Twitter's users' First Amendment Rights in any way. Still, the government applies the test that controls when a grand jury subpoena violates First Amendment rights. The government contends that it has demonstrated a compelling interest in investigating Justin Shafer's alleged cyberstalking of FBI Agent ██████████. The government further asserts that there is a sufficient relationship between that interest and the information sought from the Twitter accounts listed in the Subpoena, because the government wants to determine whether the users were accomplices of Shafer or have knowledge of his alleged crime.

### Legal Standards

The Court has authority under Federal Rule of Criminal Procedure 17(c) to quash or modify a grand jury subpoena "if compliance would be unreasonable or

oppressive." FED. R. CRIM. P. 17(c)(2); *In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Reyes-Requena*, 913 F.2d 1118, 1127 (5th Cir. 1990). As a "general rule," "courts should normally enforce grand jury subpoenas." *Reyes-Requena*, 913 F.2d at 1128; *see also United States. v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991) ("[A] grand jury subpoena issued through normal channels is presumed to be reasonable."). But that general rule "does not conflict with the court's Rule 17(c) supervisory authority to modify or quash a subpoena whose timing may be oppressive or unreasonable," although "[e]ach claim for relief must be carefully and independently evaluated under Rule 17(c)." *Reyes-Requena*, 913 F.2d at 1128-29. "Rule 17(c) offers a vehicle for a subpoenaed party to assert a constitutional, statutory, or common-law privilege." *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 585 (4th Cir. 2007). *See generally United States v. Calandra*, 414 U.S. 338, 346 (1974) (explaining that the grand jury's subpoena power does not allow it to violate "a valid privilege, whether established by the Constitution, statutes, or the common law").

I.    Standing

A party challenging a subpoena must have standing to do so. A party's ability to sue in federal court is subject to both constitutional and prudential limits. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). First, the Constitution mandates that every plaintiff make out a "case or controversy" within the meaning of Article III by alleging "such a personal stake" as to warrant his invocation of federal-court jurisdiction. *Id.* at 498; *see also* U.S. Const. art. III, § 2. "To satisfy Article III's standing requirements, a plaintiff

must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (internal citations omitted). These Article III standing "elements of injury, causation, and redressability are an 'irreducible constitutional minimum,' no more subject to being waived in First Amendment cases than in any other," *Serv. Emps. Int'l Union, Local 5 v. City of Houston* (*SEIU*), 595 F.3d 588, 597 (5th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Second, even where a party has alleged a sufficient injury to meet Article III's standing requirements, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights of third parties." *Warth*, 422 U.S. at 499. This prudential limit on standing prevents federal courts from unnecessarily adjudicating constitutional issues and ensures that a complainant can authoritatively present a complete perspective. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220-21 (1974).

But the Supreme Court has identified situations were competing interests justify a relaxation of the prudential limits on third-party standing. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). "Where practical obstacles prevent a party from asserting rights on behalf of itself, for example, the Court has recognized

the doctrine of *jus tertii* standing." *Id.* A litigant seeking to assert third-party standing in such a situation must show that (1) the litigant claiming third-party standing has suffered an injury in fact to satisfy the Article III case or controversy requirement; (2) the litigant has a close relation to the party such that the litigant is an appropriate representative to effectively vindicate the party's rights; and (3) there exists some practical obstacle to the party's ability to protect his own interests. *See id.*; *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 459-60 (1958) (allowing the NAACP to assert the rights of its members in opposing a court order requiring the organization to produce its membership lists).

When these elements are met, businesses that provide an online medium of expression may assert their online users' First Amendment rights in opposing a party's request for information. *See East Coast Test Prep LLC v. Allnurses.com, Inc.*, 167 F. Supp. 3d 1018, 1022 (D. Minn. 2016) (holding that a website had third-party standing to litigate its pseudonymous users' interests in opposing production of their identities); *McVicker v. King*, 266 F.R.D. 92, 97 (W.D. Penn. 2010) (finding that a media company had standing to assert its anonymous bloggers' First Amendment rights in opposing a subpoena); *Enterline v. Pocono Med. Ctr.*, 751 F. Supp. 2d 782, 787 (M.D. Penn. 2008) (relying on *Munson*, 467 U.S. at 956, and holding that a newspaper had standing, in opposing a motion to compel, to assert the free speech rights of anonymous posters in its online forums); *cf. In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461 et seq.*, 706 F. Supp. 2d 11, 17 n.3 (D.D.C. 2009) (finding, without discussion,

that a company had third-party standing to challenge a grand jury subpoena on behalf of its customers); *In re Verizon Internet Servs., Inc.*, 257 F. Supp. 2d 244, 258 (D.D.C. 2003) (without discussing Article III requirements, finding third-party standing for a cellular data service to raise the free speech rights of its customers in opposing a subpoena), *rev'd on other grounds sub nom. Recording Indus. Ass'n of Am., Inc. V. Verizon Internet Servs., Inc.*, 351 F.3d 1229 (D.C. Cir. 2003).

But only a few courts have contemplated the First Amendment rights of a business's customers in the specific context of deciding the business's motion to quash a grand jury subpoena. *See In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461 et seq.*, 706 F. Supp. 2d at 17 n.3; *In re Grand Jury Subpoena to Amazon.com Dated August 7, 2006*, 246 F.R.D. 570 (W.D. Wis. 2007) (without addressing standing, noting that "Amazon has a legitimate concern that honoring the instant subpoena would chill online purchases by Amazon customers," and that "[t]his First Amendment concern is a factor for the court").

## II.   Grand Jury Subpoenas Affecting First Amendment Rights

Like any speaker, Internet users wield the full power of the First Amendment. *See Reno v. ACLU*, 521 U.S. 844, 870 (1997) (finding "no basis for qualifying the level of First Amendment scrutiny that should be applied to [the Internet]"). One aspect of First Amendment protections Internet users thus enjoy is the right to remain anonymous. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995)). Acting as a shield from the tyranny of the majority, anonymity ensures all who wish to enter

the marketplace of ideas may do so    the public benefits most when disclosure is not a condition of entry. *See id.* at 342, 357.

But First Amendment rights are not absolute. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 529, 570 (1976). Free speech is "limited by the constitutional right of defendants to a fair trial and by the needs of government to obtain just convictions and to preserve the confidentiality of sensitive information ...." *United States v. Chagra*, 701 F.2d 354, 364 (5th Cir. 1983) (footnotes, quotation marks, and citations omitted).

Still, the government does not have an unlimited right to impinge on First Amendment freedoms in grand jury investigations. *See Branzburg v. Hayes*, 408 U.S. 665, 708 (1972). Although the United States Supreme Court has at least twice suggested that courts deciding a motion to quash a grand jury subpoena should account for First Amendment concerns, *see R. Enters., Inc.*, 498 U.S. 292; *Branzburg*, 408 U.S. 665, it has never articulated a standard for evaluating grand jury subpoenas that directly infringe on recognized First Amendment rights. Similarly, the Fifth Circuit has provided little guidance on the test that applies when a grand jury subpoena requests information that the First Amendment protects.

Courts of Appeal that have addressed the issue have adopted a test where a grand jury subpoena will be enforced despite a First Amendment challenge if the government can show: (1) the subpoena serves a compelling state interest; and (2) the requested evidence is substantially related to the investigation (taking these elements together, the "substantial relationship test"). *See In re Grand Jury Subpoenas Duces*

*Tecum*, 78 F.3d 1307, 1312 (8th Cir. 1996); *In re Grand Jury Proceeding*, 842 F.2d 1229, 1233 (11th Cir. 1988) (citing to *Gibson v. Fl. Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963)); *In re Grand Jury Proceedings*, 776 F.2d 1099, 1102-03 (2d Cir. 1985); *Bursey v. United States*, 466 F.2d 1059, 1083 (9th Cir. 1972); *cf. Gibson*, 372 U.S. at 546 (applying the test above and holding that the state legislative committee could not compel a race relations association president to produce membership records).

Some courts have interpreted one Fifth Circuit Case, *Glass v. Heyd*, 457 F.2d 562 (5th Cir. 1972)*,* to set forth the two-part substantial relationship test described above. *See, e.g.*, *In re Grand Jury Subpoenas Duces Tecum*, 78 F.3d at 1212. In *Glass*, the grand jury was probing alleged criminal activity of members of an organization, and the government subpoenaed the organization's attorney. *See* 457 F.2d at 564. Testifying at a hearing on his motion to quash, the attorney declined to name the specific individuals to whom he spoke during his attorney-client relationship with the organization, citing *Patterson*, 357 U.S. 449, and *Gibson*, 372 U.S. 539, "in support of his contention that the State must have a 'compelling interest' to require the disclosure of names of members of controversial or unpopular organizations." *Glass*, 457 F.2d at 564. Finding that the state had a compelling interest in the attorney's answer to the question and that there was a sufficient nexus between the motion to quash hearing where the question was asked and the grand jury investigation itself, the Court of Appeals affirmed the attorney's contempt conviction. *See id.* at 566.

Although the Fifth Circuit in *Glass* did not explicitly develop the substantial

relationship test as a standard for assessing grand jury subpoenas that directly infringe on First Amendment rights, the undersigned interprets *Glass* as authorizing the substantial relationship test's application here.

But the Supreme Court has suggested that, when a grand jury subpoena does not directly infringe on recognized First Amendment rights, the government need not satisfy the substantial relationship test. *See Univ. of Penn. v. EEOC*, 493 U.S. 182, 201 (1990) ("Because ... the EEOC subpoena process does not infringe any First Amendment right enjoyed by petitioner, the EEOC need not demonstrate any special justification...."); *Branzburg*, 408 U.S. at 701-06 ("If there is no First Amendment privilege to refuse to answer the relevant and material questions asked during a good-faith grand jury investigation, then it is a fortiori true that there is no privilege to refuse to appear before such a grand jury until the Government demonstrates some 'compelling need' for a newsman's testimony."). This reluctance to constrict the grand jury's subpoena power reflects "the longstanding principle that the public ... has a right to every man's evidence, except for those persons protected by a constitutional, common-law, or statutory privilege." *Branzburg*, 408 U.S. at 688 (citations and internal quotations omitted).

In *Branzburg*, which the government relies on in this case, the issue was whether requiring news reporters to appear and testify before federal grand juries violated the First Amendment. *See id.* at 667. Acknowledging that the flow of news could be diminished by compelling newsmen to reveal their confidential sources, *see id.* at 694,

the court nonetheless concluded that the grand jury subpoena did not infringe on the reporters' First Amendment rights, *see id.* at 691. As a result, the court declined to impose the substantial relationship test as an added burden on the government, noting, in any event, that the government had met the test's requirements. *See id.* at 705-08.

Following the Supreme Court's guidance, Courts of Appeal, including the Fifth Circuit, have declined to apply the substantial relationship test where a grand jury subpoena does not directly abridge First Amendment rights. *See In re Grand Jury Subpoena Duces Tecum Issued on April 22, 1991 to Records Custodian*, No. 94-60047, 36 F.3d 90, 1994 WL 523913, at *2 (5th Cir. Sept. 15,1994) (affirming a contempt order where a speculative chilling effect was not sufficient to require heightened scrutiny of a subpoena seeking a video store's business records); *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 234 (4th Cir. 1992) (noting that the substantial relationship test did not apply because "this is not a case in which First Amendment rights are implicated," despite the alleged chilling effect of a subpoena seeking customer lists from an adult bookstore).

Where a subpoena only indirectly implicates values of expression, the First Amendment nonetheless limits the power of a grand jury to interfere with a witness' First Amendment freedoms. *See Branzburg*, 408 U.S. at 701 (Powell, J., concurring) (explaining that courts should balance any First Amendment implications against society's need for effective grand juries); *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d at 234 (concluding that no First Amendment rights were implicated, and

-12-

instructing the district court to, "[u]nder Justice Powell's analysis in *Branzburg* ... balance the possible constitutional infringement and the government's need for documents when it rules on the motion to quash, on a case-by-case basis and without putting any special burden on the government"); *Ealy v. Littlejohn*, 569 F.2d 219, 227, 227 n.22 (5th Cir. 1978) (citing to *Branzburg*, and Justice Powell's concurrence, specifically, for the conclusion "that the First Amendment can serve as a limitation on the power of the grand jury to interfere with a witness' freedoms of association and expression"). "[T]hat limitation is defined in terms of relevancy to the crime under investigation. When the grand jury goes on a fishing expedition in forbidden waters, the courts are not powerless to act." *Ealy*, 569 F.2d at 227; *see also R. Enters.*, 498 U.S. at 300 ("Grand juries are not licensed to engage in arbitrary fishing expeditions.").

## Analysis

The undersigned concludes that the Court should grant Twitter's Motion to Quash as to @dawg8u and @abtnatural but deny the Motion to Quash as to @PogoWasRight, @Popehat, and @associatesmind.

Whether the Motion to Quash should be granted depends on five issues: (1) whether Twitter has third-party standing to challenge the Subpoena; (2) whether the Subpoena directly infringes any First Amendment rights; (3) whether the government has satisfied the substantial relationship test for the users whose rights the Subpoena directly infringes; (4) whether the Subpoena indirectly implicates any First Amendment rights; and (5) whether, for the users whose First Amendment rights are indirectly implicated, the government's need for information outweighs the free speech concerns

at play.

The Court should grant Twitter's Motion to Quash as to @dawg8u and @abtnatural because (1) Twitter has standing; (2) the Subpoena directly infringes the First Amendment right to anonymous speech of @dawg8u and @abtnatural; and (3) the government has not shown a substantial relationship between its compelling interest in investigating Shafer and the requested information on @dawg8u and @abtnatural.

The Court should deny Twitter's Motion to Quash as to @PogoWasRight, @Popehat, and @associatesmind because (1) Twitter has standing; (2) the Subpoena directly infringes the First Amendment right to anonymous speech of @PogoWasRight; (3) the government has satisfied the substantial relationship test for @PogoWasRight; (4) the Subpoena does not directly infringe First Amendment rights of @Popehat and @associatesmind; and (5) the government's need for the requested information regarding @Popehat and @associatesmind outweighs the First Amendment implications for those users.

I.    Twitter has standing to challenge the Subpoena on the basis of its users' First Amendment rights.

For Twitter to challenge the Subpoena on behalf of Twitter's users, (1) Twitter must have an Article III injury in fact, (2) Twitter must have the requisite closeness to its users, and (3) Twitter's users must be hindered from asserting their own rights.

The parties contest only the first two elements   injury in fact and closeness. The undersigned finds that the third is satisfied, because Twitter has presented sufficient evidence that its users are hindered from asserting their own First Amendment rights,

even without the Gag Order. Twitter's anonymous users face practical obstacles in protesting the Subpoena while remaining anonymous. *See Patterson*, 357 U.S. at 459 ("To require that [the right to anonymity] be claimed by the members themselves would result in nullification of the right at the very moment of its assertion."); *Enterline*, 751 F. Supp. 2d at 785 ("This loss of anonymity is the very harm that Respondent seeks to prevent."). And Twitter has established that its non-anonymous users face practical obstacles, citing high litigation costs as one. Although the cost of litigation, alone, may represent merely a factor in deciding whether to pursue a claim, the Supreme Court has found that, where there is a contrasting lack of economic incentive, the daunting expense of litigation presents a sufficient hindrance to warrant third-party standing. *See Powers v. Ohio*, 499 U.S. 400, 415 (1991) ("And, there exist considerable practical barriers to suit by the excluded juror because of the small financial stake involved and the economic burdens of litigation."). Here, Twitter's users have a small financial stake in moving to quash the Subpoena in comparison to the potentially prohibitive costs of doing so. The undersigned finds that the cost Twitter cites is a sufficient obstacle to its non-anonymous users and concludes that Twitter's anonymous and non-anonymous users are hindered from asserting their own rights.

As to the remaining, contested elements of third-party standing    injury in fact and closeness    the undersigned finds that they are also satisfied for the reasons discussed below and concludes that Twitter has third-party standing to bring its Motion to Quash because Twitter has suffered an injury in fact, Twitter has a sufficiently close relationship with its users, and Twitter's users are hindered from asserting their own

rights.

A.   **Twitter has established its injury in fact because Twitter showed that complying with the Subpoena harms Twitter's ability to keep, attract, and encourage users, which, in turn, limits Twitter's ability to maximize profits.**

To establish an Article III injury in fact, Twitter "must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of Earth, Inc.*, 528 U.S. at 180-81 (internal citations omitted). The undersigned concludes that Twitter has shown that, as a result of the Subpoena, Twitter imminently will suffer a concrete and particularized injury that quashing the Subpoena will redress, because Twitter established that the Subpoena jeopardizes the size and activeness of Twitter's user base, compromises Twitter's business model, and decreases Twitter's potential profits.

Twitter argues that it suffers the requisite injury because "people won't use our service as much if we are perceived as a service that's targeted by the Government anytime somebody speaks out on a matter of public concern and we frankly don't do anything about it." Dkt. No. 20 at 38 of 48, lines 7-11. The undersigned previously noted, and the Court agreed, that, by itself, such a bare statement of injury is insufficient to satisfy the Article III case-or-controversy requirement. *See* Dkt. No. 21 at 12. Twitter must demonstrate its personal stake in having users who feel comfortable speaking their minds. *See id.* at 13.

At the evidentiary hearing on Twitter's injury in fact, Twitter precisely explained its personal stake and demonstrated how the Subpoena causes it injury. ▮▮▮▮▮▮▮▮, a trust and safety specialist at Twitter, explained that, according to Twitter's 2017 Annual Report, factors negatively affecting Twitter's user growth and engagement include if (1) "[t]here are user concerns related to privacy and communication, safety, security, spam or other hostile or inappropriate usage or other factors," Dkt. No. 30 at 15; and (2) Twitter does not maintain its brand image or its reputation is damaged, *see id.*

Twitter then established that complying with the Subpoena implicates both factors. First, if the Subpoena were enforced, "[u]sers wouldn't feel comfortable expressing themselves and they   for fear of maybe a government wanting to get their information ... wouldn't want to express themselves freely." Dkt. No. 31 at 8, lines 9-13. Second, Twitter's compliance with the Subpoena would cause Twitter negative publicity surrounding Twitter's privacy and security practices. *See id.* at 8, lines 14-19. The Subpoena would thus encourage Twitter's existing users to tweet less or stop tweeting altogether and would discourage potential new users from seeking Twitter's services.

And Twitter further explained that it suffers injury when its ability to maintain a large and active user base is threatened. Twitter has a financial stake in maintaining a large and active pool of users, anonymous or not, that tweet freely: "Our financial performance has been and will continue to be significantly determined by our success in growing the number of users and increasing their overall level of engagement on our platform as well as the number of ad engagements." Dkt. No. 30 at 15. According to

Twitter's 2017 Annual Report, a smaller, less active user base hurts Twitter because

> [i]f our users or content partners do not continue to contribute content or
> such content is not viewed as unique or engaging by other users, we may
> experience a decline in the number of users accessing our products and
> services and user engagement, which could result in the loss of content
> partners, advertisers, platform partners and revenues.

*Id.* at 16. Because Twitter generates a "substantial majority" of its revenue from advertising, Twitter's inability to achieve maximum growth in its user base negatively affects its profits. *Id.*

Twitter also showed that its compliance with the Subpoena harms Twitter's ability to compete in the marketplace. ▆▆▆▆▆ testified that "people compare service providers based on the extent to which they scrutinize government requests for user data," Dkt. No. 31 at 12, lines 9-12; and that, "if users don't believe or trust that they can speak openly on the Twitter platform, they'll go elsewhere and [Twitter's] advertisers would follow," *id.* at 7, lines 17-19.

The government maintains that Twitter's injury is too speculative and uncertain to meet the Article III case-or controversy requirement. But other courts have acknowledged that service providers who facilitate anonymous speech suffer injury if users' anonymity is compromised. *See Glassdoor, Inc. v. Superior Court*, 9 Cal. App. 5th 623, 630 (Cal. App. 2017) ("In exchange [for anonymity], Glassdoor receives content which, it hopes, will draw readers to its site and from which it undoubtedly hopes to derive revenue."); *In re Subpoena Duces Tecum to America Online, Inc.*, 52 Va. Cir. 26, 32 (Va. Cir. Ct. 2000) ("If AOL did not uphold the confidentiality of its subscribers ... one

could reasonably predict that AOL subscribers would look to AOL's competitors for anonymity.").

And, as Twitter notes, the trend among federal district courts is to find injury in fact where an organization, like Twitter, whose business provides a valuable medium of expression, is asked betray its customers' trust by complying with a subpoena, *see, e.g.*, *East Coast Test Prep LLC*, 167 F. Supp. 3d at 1022; *McVicker*, 266 F.R.D. at 97, especially where doing so causes financial harm, *see Enterline*, 751 F. Supp. 2d. at 786 (finding that a newspaper had injury in fact where it demonstrated that failure to protect anonymous commentators will "compromise the vitality of the newspaper's online forums, sparking reduced reader interest and a corresponding decline in advertising revenues"); *cf. Patterson*, 357 U.S. at 459 (finding that the NAACP would suffer financial injury where organization alleged the production order would decrease membership and thereby deprive the organization of dues and contributions).

And, prior to the evidentiary hearing, the government argued that one reason Twitter had not established injury in fact was because "unlike the cases that Twitter cites ... Twitter faces no financial loss." Dkt. No. 13 at 12. Twitter has since remedied that shortcoming.

The undersigned finds the cases discussed above persuasive. Here, Twitter has shown that enforcement of the Subpoena discourages Twitter's users, anonymous or not, from using Twitter's services and from contributing controversial content. Twitter demonstrated that its compliance with the Subpoena sends the message to Twitter

users worldwide, first, that their anonymous tweets may not stay anonymous and, second, that expressing their unpopular views may subject them to unwanted government investigation. And Twitter adequately explained that its user base is threatened as a result.

More importantly, Twitter explained how it suffers injury when its user base is reduced and inhibited. Twitter showed that encouraging user expression is essential to its business model: fewer users and tweets means fewer advertisers, and the bulk of Twitter's profits come from advertising. Twitter also established that it competes with other businesses like Twitter to provide the most protected platform of expression and that users may go elsewhere if Twitter is forced to comply with requests like the Subpoena.

At the evidentiary hearing on Twitter's injury in fact, the government, on cross examination of ████████, pointed out that the Subpoena requests information for only five users   a small percentage of Twitter's user base   and that, despite complying with subpoenas in the past, Twitter's profits and users have increased over the past several years. But the supposed slightness of Twitter's alleged injury is not dispositive. "'Injury in fact' reflects the statutory requirement that a person be 'adversely affected' or 'aggrieved,' and it serves to distinguish a person with a direct stake in the outcome of a litigation   even though small   from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973). The size of its injury aside, Twitter has alleged a specific and perceptible harm   lost, less active users and decreased potential profits   that establishes its direct

-20-

stake in quashing the Subpoena.

The undersigned thus concludes that Twitter has established its injury in fact as required by Article III.

B.   **Twitter has a sufficiently close relationship with its users because Twitter and its users have identical interests in uninhibited expression such that Twitter will effectively advocate on its users' behalf.**

To satisfy the closeness element of the third-party standing test, Twitter "must establish that it and the third party have a 'close relation,' such that 'their interests coincide.'" *In re Deepwater Horizon*, 857 F.3d 246, 252-53 (5th Cir. 2017) (citations omitted). The undersigned concludes that Twitter has satisfied the closeness requirement because Twitter and its users reap mutual benefit when Twitter protects its users First Amendment rights.

Twitter has a clear incentive for fervently protecting its users' First Amendment rights. In its Motion to Quash, Twitter notes that, "as a platform for free expression ... [Twitter has] its own interests in ensuring that its users are not dissuaded from speaking their minds on issues of public importance." Dkt. No. 16 at 26. And, as Twitter explained in the evidentiary hearing, the more often and freely Twitter's users express themselves, the more advertisers Twitter attracts, and the more Twitter profits. Twitter's business is thus dependent on its users' ability to fully express themselves on Twitter's platform.

The government argues in its response brief that Twitter's relationship with its users is not close enough because Twitter charges no user fees, makes money from

advertising and data-mining, and has suspended users whose tweets conflict with Twitter's corporate standards. But that argument misses the mark. The closeness requirement focuses on similarity of interests and whether the litigant asserting third-party standing "can reasonably be expected to properly frame the issues and present them with the necessary adversarial zeal." *Munson*, 467 U.S. at 956; *see also In re Deepwater Horizon*, 857 F.3d at 252-53 ("The whole purpose behind this 'close relation' factor is to ensure that the [appellant] will act as an effective advocate for the party whose interests it seeks to represent." (internal quotations and citation omitted)). And here, Twitter has explained its clear interest in ferociously advocating for its users' First Amendment rights    Twitter benefits most when its users have an accessible, unrestrained means of expression.

Twitter has thus satisfied the closeness requirement in this case.

The undersigned notes that, in its response brief, the government argues that, even if Twitter has the requisite injury in fact and satisfies the closeness requirement, Twitter nonetheless lacks standing because the Subpoena "infringes no rights," whether Twitter's or its users'. But the third-party standing inquiry does not require a litigant to prove an injury in fact for a party whose rights the litigant seeks to assert. And, regardless, the government's argument is clearly inconsistent with First Amendment case law and the protections the Supreme Court has extended to anonymous speech.

II. The Subpoena infringes the First Amendment right to remain anonymous of @PogoWasRight, @dawg8u, and @abtnatural but does not directly infringe on First Amendment rights of @Popehat and @associatesmind.

Whether the substantial relationship test applies to limit the scope of the

Subpoena depends on whether it directly infringes any recognized First Amendment rights. The right to speak anonymously is clearly recognized, *see McIntyre*, 514 U.S. 334, and the Subpoena directly infringes on that right as to @PogoWasRight, @dawg8u, and @abtnatural by compelling disclosure of their concealed identities. The government's opposing position at oral argument on Twitter's original motion — that if the government does not approach these users after gaining their identities through the Subpoena, then there is no First Amendment violation at all — fails to persuade. A tree that falls in an empty forest still makes a sound; and the Twitter users' First Amendment right to anonymity is infringed whether they know it or not. The substantial relationship test applies to @PogoWasRight, @dawg8u, and @abtnatural.

But, for the substantial relationship test to apply to the users who — Twitter admits — have identified themselves, @Popehat and @associatesmind, Twitter must show that the Subpoena directly infringes some other First Amendment right.

First, Twitter makes a bare-bones argument that the Subpoena infringes on the users' right to association and cites to *Patterson* for support. In that case, a production order required the NAACP to reveal its member lists, which were otherwise kept private. *See Patterson*, 357 U.S. at 462. Challenging the order, the NAACP showed that "on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* at 463. There was little doubt that compelled disclosure of the organization's otherwise-secret member lists would likely

effect a "substantial restraint" on the members' freedom of association. *Id.* at 462. And so the Supreme Court required the state to show a sufficient interest in the disclosures to justify their deterrent effect. *See id.* at 463.

Although in *Patterson*, the Supreme Court imposed an added burden on the government to show a controlling justification for the production order's adverse effects on free speech, it neither considered nor applied the substantial relationship test for which Twitter argues. Moreover, in this case, the chilling effect of the Subpoena on @Popehat's and @associatesmind's right to associate is nowhere near as certain and deterring as in *Patterson*.

While *Patterson* involved an element of privacy and anonymity, the associations that Twitter seeks to preserve are not "private" in any sense. @Popehat and @associatesmind have willingly identified themselves and have exposed their stances on controversial issues, and their contacts with other Twitter accounts are visible on their profile pages. On these facts, compelled disclosure of the non-anonymous Twitter users' information does not restrain their First Amendment right to privately associate and does not justify imposing an added burden on the government.

*Ealy*, which Twitter also cites, provides little additional support for Twitter's contention that the Subpoena infringes its users' right to associate. Similar to the Supreme Court in *Patterson*, the Fifth Circuit in *Ealy* neither considered nor applied the substantial relationship test. In *Ealy*, the government sought expansive records from an organization after one of its members was shot to death. *See* 569 F.2d at 222, 229.

After initial grand jury proceedings, the organization circulated a leaflet claiming that the government failed to conduct a serious investigation into the boy's death because he was black. *See id.* at 223. The presiding judge immediately called the grand jury back into session, but, when it reconvened, the grand jury spent a substantial amount of time probing the internal, structural, financial, and associational aspects of the organization. *See id.* at 230.

The organization sought an injunction and damages against the government, arguing that the grand jury's inquiries were in bad faith and violated the members' First Amendment right to associate. *See id.* at 223-24. The Court of Appeals concluded that "the grand jury had no right to intrude into United League matters having not the remotest relationship to that tragic event and its investigation" and that the grand jury had acted with intent to harass those who, in the exercise of their First Amendment rights, had sharply criticized the investigation in the organization's leaflet. *Id.* at 229.

Both the substantive law applied and the facts at issue in *Ealy* are distinct from those in this case. The *Ealy* court did not apply the substantial relationship test, as Twitter argues for here, but rather conducted a fact-specific analysis of the grand jury's bad faith conduct in retaliating against the organization's members.

Although Twitter argues that the government is using the Subpoena to silence its critics, there are simply no signs that the government acted in bad faith in pursuing the Subpoena. The Subpoena is relatively narrow, seeking basic identification information   names, e-mail addresses, and IP addresses   for just a handful of users

that may have had contact with the government's suspect. The Subpoena's effect on Twitter's unidentified users does not approach the invasive and harassing behavior of the grand jury in *Ealy*.

Twitter suggests that the Subpoena also infringes its users' right to receive ideas, but this contention fails for similar reasons. The Subpoena neither directly nor substantially disables Twitter's users from receiving anything. Twitter's argument is, at its core, that the Subpoena has a chilling effect   that Twitter's users will be discouraged from participating in the exchange of ideas if the government can investigate them for receiving controversial information. Although the chilling of protected free speech is certainly a concern in this case, and one that the undersigned does not take lightly, the Supreme Court and Fifth Circuit have rejected similar arguments for applying a heightened scrutiny to subpoenas. *See Univ. of Penn.*, 493 U.S. at 200 (noting the chilling effect petitioner feared was a remote, attenuated, and speculative injury to academic freedom, and it was insufficient to justify heightened scrutiny); *In re Grand Jury Subpoena*, 1994 WL 523913 at *2 ("Mere ... speculation of chilling consequence of a subpoena do[es] not suffice.").

Nonetheless, Twitter cites to several cases that justify application of the substantial relationship test by finding a right to receive information anonymously. As discussed above, the undersigned agrees that the substantial relationship test should apply as to Twitter's anonymous users: @PogoWasRight, @dawg8u, and @abtnatural. But two of Twitter's users   @Popehat and @associatesmind   have willingly and publicly relinquished their anonymity. For these users, their ability to exchange

information is hardly compromised by the government confirming their identities through the Subpoena.

Again, Twitter's argument boils down to a chilling effect. And the undersigned emphasizes that the risk of a chilling effect is clear, and a consideration in this case that is addressed below. But, because the Subpoena inflicts no direct effect on the users' rights to associate and receive ideas, the substantial relationship test does not apply as to @Popehat and @associatesmind.

III.   The government has satisfied the substantial relationship test as to @PogoWasRight but not as to @dawg8u and @abtnatural.

Because the Subpoena directly infringes the First Amendment right to anonymous speech of @PogoWasRight, @dawg8u, and @abtnatural, the government must satisfy the substantial relationship test as to those users. For the Subpoena to survive Twitter's First Amendment challenge, the government must demonstrate that the requested evidence is substantially related to a compelling state interest.

Because the government has shown that the identity of @PogoWasRight is substantially related to its compelling interest in investigating the alleged cyber-harassment of FBI Agent ████, Twitter's Motion to Quash should be denied as to @PogoWasRight. But the government has not made the requisite showing as to @dawg8u and @abtnatural, and Twitter's Motion to Quash should be granted in part as to these two users.

The government has shown a substantial relationship between its investigation of Justin Shafer and the information it seeks from Twitter regarding just one user:

@PogoWasRight. At oral argument on Twitter's Motion to Quash Subpoena and Vacate Gag Order, the government presented evidence that @PogoWasRight frequently contacted Justin Shafer via his Twitter account @JShafer817, dating back to January of 2014. *See* Dkt. No. 20 at 10, lines 8-10. Special Agent ████████ testified that, in addition to several tweets where @JShafer817 mentions @PogoWasRight, there are multiple private, direct messages, between the two accounts. *See id.* at 19, lines 10-11. Special Agent ████████ also testified that on multiple occasions, Justin Shafer sought to ask his wife to reach out to @PogoWasRight to provide information regarding Shafer's case. *See id.* at 15, lines 23-25.

In light of these multiple confirmed and direct contacts, plus Shafer's interest in discussing his own case with @PogoWasRight, the government has made the requisite showing that identifying information for @PogoWasRight is substantially related to its investigation of Justin Shafer and his alleged crimes against Agent ████. Accordingly, the Motion to Quash should be denied as to @PogoWasRight.

But the government has shown little connection between Shafer and the two remaining users, @dawg8u and @abtnatural. There is no previous association between Shafer and @dawg8u or @abtnatural. *See id.* at 10, lines 22-23. The only contact outlined in the government's brief is when @JShafer817 mentioned, without comment, @dawg8u and @abtnatural on a post about the *Rivello* complaint. *See* Dkt. No. 13 at 10. Admittedly, the government is not investigating these accounts as Shafer's possible coconspirators. *See* Dkt. No. 20 at 25, lines 16-20. The government states that it is more

interested in finding out whatever additional information the persons behind these accounts can provide. *See id.*

The government also indicates that it wishes to investigate whether @dawg8u is inciting others, besides Shafer, to cyber-harass FBI Agent ████, *see id.* lines 1-7, pointing to @dawg8u's comment about Agent ████ being "the least busy FBI Agent of all time." That comment, the government argues, associated @dawg8u with Shafer's victim and thus provides a substantial relationship between @dawg8u's information and the government's compelling interest.

But the undersigned disagrees. That @dawg8u made a public comment about the agent involved in a high-profile case simply does not connect that user to Shafer and his crimes. Suggesting otherwise would give the government blanket authority to subpoena information on any Twitter user who expressed criticism of FBI Agent ████ or the government's involvement in *Rivello*, without regard to core First Amendment protections.

Although the government's stated motivations for obtaining @dawg8u's and @abtnatural's information may pass muster in cases where a subpoena does not offend First Amendment freedoms, here, the government has an added burden. The undersigned concludes that the government has failed to meet that burden as to @dawg8u and @abtnatural, because it has not shown a substantial relationship between the identifying information for those two users and its investigation of Shafer's alleged crimes against Agent ████.

IV.   The First Amendment concerns as to @Popehat and @associatesmind do not

-29-

outweigh the government's interest in investigating the alleged harassment of FBI Agent ███.

Because the Subpoena does not directly infringe on First Amendment rights of @PopeHat and @associatesmind, the undersigned concludes above that the substantial relationship test does not apply as to these users. Instead, focusing on the specific facts of this case, and placing no additional burden on the government, the Court must balance the free speech concerns at play, including any potential chilling effect, with the government's need for the information it seeks. Here, although the Subpoena certainly implicates First Amendment values, the government's need for the requested information prevails.

In oral argument on Twitter's Motion to Quash and Vacate, the government indicated that it would use identifying information for @Popehat and @associatesmind to obtain further evidence on the Shafer case and "dispute or disprove [whether] there [are] any coconspirators or instigators." Dkt. No. 20 at 35, lines 7-10. Specifically, the government seeks to interview @Popehat and @associatesmind and find out if they have knowledge of Shafer's behavior and mindset in harassing Agent ███. *See id.* at 18, lines 7-14.

The @Popehat account is associated with a legal blog, Popehat.com, that addresses cutting-edge legal issues and was supposedly co-founded by Ken White, a criminal defense lawyer in Los Angeles. *See* Dkt. No. 2 at 11. During oral argument, Special Agent ███ testified for the government that Shafter's contacts with @Popehat date back to December 2014. *See* Dkt. No. 20 at 10, lines 10-13. These visible

contacts are not particularly intimate   @Popehat posted something related to the *Rivello* case and Shafer retweeted it or commented on it, *see id.* at 19, lines 10-12   but nonetheless indicate some connection to Shafer and his interest in *Rivello* and Agent ███.

The @associatesmind account, like @Popehat, is connected to a legal blog, AssociatesMind.com. *See* Dkt. No. 2 at 11. Purportedly started by an Alabama lawyer named Keith Lee, *see id.* at 11, Twitter notes that the blog has featured six articles regarding *Rivello*, *see* Dkt. No. 2 at 13. The @associatesmind activity that sparked the government's interest also relates to the user's discussion of the highly controversial case: a @Popehat tweet about *Rivello* elicited a reply from @associatesmind. *See* Dkt. No. 20 at 21, lines 18-19. @JShafer817 does not follow @associatesmind on Twitter, *see id.* at 22, lines 7-9, but has tweeted at @associatesmind in the past, *see* Dkt. No. 13 at 10. In a string of tweets on March 21, 2017, @JSchafer817 discusses *Rivello* and his search for information on Agent ███ and tags @associatesmind. *See id.*

Although at various points of the government's brief and oral argument, the government alluded to its need to investigate Shafer's potential coconspirators, the government has suggested that it does not actually suspect @Popehat or @associatesmind of participating in Shafer's alleged crime. *See* Dkt. No. 20 at 25, lines 16-20. Of course, even if a user is excluded as a coconspirator, the information that user provides in an interview could nonetheless advance the government's investigation, suggesting new avenues of exploration while closing off others.

There is at least some evidence that both users have been contacted by Shafer regarding the *Rivello* case, a topic inextricably tied to Agent ██████ and Shafer's motivation for allegedly harassing him.

In contrast, there is little risk that the Subpoena will chill protected speech of @Popehat and @associatesmind in the sense that they might refrain from exercising their free speech rights in order to avoid punishment. The government explained that it wants to contact @Popehat and @associatesmind to obtain information that the government can use against Shafer, not the users themselves. @Popehat and @associatesmind are not being targeted, as Twitter maintains, for making comments on a matter of public importance; those comments may connect them, in one way or another, to a criminal whom the government is investigating.

Still, Twitter contends that the government's need for the users' information sought is too slight to justify the Subpoena's effects on First Amendment rights. Twitter's concerns that the Subpoena will chill the speech of @PopeHat and @associatesmind are valid. If the government investigates individuals for commenting on a matter of public importance, then those individuals may be reluctant to speak out in the future. Both @Popehat and @associatesmind run legal blogs dedicated to discussing novel and controversial legal issues like those presented in *Rivello*. @Popehat tweets on such issues to his approximately 67,800 followers. The public benefits from @PopeHat and @associatesmind's contributions to the marketplace of ideas, and the importance of encouraging @PopeHat and @associatesmind to continue exercising their free speech rights is clear.

But the undersigned doubts what effect enforcing the Subpoena, specifically, will have on the users' First Amendment rights. As Twitter points out, the Twitter profiles for both @Popehat and @associatesmind are linked to blogs with identified creators lawyers Keith Lee and Ken White    whose e-mail addresses, phone numbers, and photos are available on the their respective law firms' websites. But the availability of Lee and White's contact information detracts from Twitter's position that the Subpoena itself could chill these users' free speech. The breadth of the information that the government seeks hardly exceeds the information publicly available. Even without the Subpoena, the government can investigate @Popehat and @associatesmind to at least some degree. Whatever potential chilling effect the government's investigation will have is thus only slightly worsened by enforcing the Subpoena and requiring Twitter to provide information to confirm the users' identities.

But Twitter argues that the Subpoena does more than just confirm the user's identities. By gaining access to IP addresses, Twitter maintains, the government can gain access to other confidential or privileged information. Because the undersigned cannot see how an IP address would reveal confidential communications, this argument is unpersuasive and does not advance Twitter's First Amendment arguments.

The undersigned appreciates that the Subpoena implicates First Amendment rights. But, as discussed, those rights are faintly more threatened by the Subpoena than by the government's ability to investigate these users based on open sources. In contrast, the government stands to gain valuable information from the Subpoena that is impersonal and narrow in scope. In addition to providing confirmation of the users'

purported identities, the Subpoena allows the government to explore what, if any, nonpublic contact the users might have had with Shafer and his potential associates. The government may thus use its broad subpoena powers to pursue its interest in the users' identities and contact @Popehat and @associatesmind if it so chooses.

And even if Twitter objected to the Subpoena, in the alternative, on relevancy grounds, which it did not, the Subpoena would stand as to @Popehat and @associatesmind. The undersigned cannot conclude "that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the subject of the grand jury's investigation." *R. Enters.*, 498 U.S. at 301. And, because the substantial relationship test does not apply to @Popehat and @associatesmind, it was Twitter's burden to defeat the strong presumption that the Subpoena is reasonable as to those users, and Twitter did not meet that burden.


## Recommendation

For the reasons and to the extent explained above, the Court should grant Movant Twitter's Motion to Quash and Vacate [Dkt. No. 1] in part. The Motion to Quash should be granted as to Twitter users @dawg8u and @abtnatural and denied as to Twitter users @PogoWasRight, @Popehat, and @associatesmind.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CRIM. P. 59(b).

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except on grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

     DATED: November 7, 2017

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE